NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: October 4, 2022

S22A0720.  LEE v. THE STATE.

MCMILLIAN, Justice.

After a jury trial in 2019, Harvey Lee was convicted of malice murder in connection with the shooting death of George Young.[1] On

---

[1] George was killed on November 16, 2017, and on June 27, 2018, a Gwinnett County grand jury indicted Lee and Tia Young for malice murder (Count 1), felony murder (Count 2), and aggravated assault (Count 3). Tia was also separately indicted for criminal attempt to commit a felony (Count 4) and criminal attempt to commit a misdemeanor (Count 5).

At a trial conducted from March 25 through April 5, 2019, a jury found Lee guilty of Counts 1 through 3 and Tia guilty of Counts 2 through 5. On April 15, 2019, the trial court sentenced Lee to serve life in prison without the possibility of parole for Count 1; the remaining counts were either merged for sentencing purposes or vacated by operation of law. Tia was sentenced to serve life in prison with the possibility of parole for Count 2, plus three years for Counts 4 and 5 to be served consecutively to Count 2. Tia's appeal (Case No. S22A0969) is docketed to the August 2022 term of this Court and is not consolidated with the current appeal.

On May 9, 2019, Lee timely filed a motion for new trial, which was amended by new counsel on November 2, 2020. Following a hearing on January 4, 2022, the trial court denied the motion on February 2, 2022. Lee filed a timely notice of appeal on February 3, 2022. The case was docketed to the April 2022 term of this Court and submitted for a decision on the briefs.

appeal, Lee claims that trial counsel rendered constitutionally ineffective assistance by failing to object to (a) evidence of George's good character, (b) a photograph of George in life with his children, and (c) the presentation of and comments on Lee's silence after he was advised of his rights under *Miranda*.[2] Because Lee has not shown reversible error, we affirm his convictions.

The evidence presented at trial showed that George and Tia Young were married and lived in Gwinnett County with their three children. George worked in security and, in an effort to help Lee, a family friend, hired Lee as a subcontractor and allowed him to live in the family's home.

Late on the night of November 16, 2017, George arrived home from work and was shot twice on his front porch. Phone records show that George was on the phone with his co-worker, Latanya Knowles, while in the car on his way home until the call ended at 11:23 p.m. Knowles testified at trial that she and George spoke until he said he

---

[2] See *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

2

arrived home and that George did not mention anything out of the ordinary during this call.

At 11:31 p.m., Tia called 911, and at 11:40 p.m., police officers arrived to find George deceased, lying on his back on the front porch with his feet facing the door. The autopsy showed that two gunshot wounds had entered the front of George's body, and the medical examiner testified that these wounds were the cause of George's death. George's keys were still in the door, and a shell casing was recovered from the porch. The home had a security system with a camera facing the front door, but the device was not working at the time of the shooting. George's eldest son testified that the camera had been broken for many months.

When interviewed by police officers at the scene, Lee said that he was sitting at the kitchen table on his computer when he heard gunshots. He then ran upstairs to get his pistol, came downstairs, and saw George. Lee ran back upstairs, put the gun away, and told Tia to call 911. Lee told the officers that he returned to George and performed CPR until a neighbor arrived and took over for him.

Tia told officers at the scene that she woke up to the sound of two gunshots. She said that Lee went to grab his gun and told her to call 911, which she did. When asked about problems in the home, Tia told officers that they "stay broke." She said she recently lost her job and that George had been borrowing money from different people. She also told officers that George had previously mentioned that a white SUV followed him on two occasions, and that, on one of these occasions, the SUV tried to run George off the road.

One neighbor testified that he heard gunshots and, after consulting with his family about the noise, looked out of his window where he could see the front of the Young house. Less than ten minutes after hearing the gunshots, the neighbor noticed a person moving from the direction of the Young house to a vehicle in the Young driveway and testified that the person was "hunched over or . . . did something to the vehicle" before running back toward the house. The neighbor continued watching and saw the person do the "exact same thing again" a minute or two later.

George and Tia's three children slept through the events and

neither heard nor saw anything. The oldest child testified that he was a heavy sleeper. Another of the children was prescribed sleeping medication, and although he did not take it regularly, Tia had given him a sleeping pill that night. Tia's mother, who also lived in the home, explained that she did not hear anything because her television's volume was high. Seven neighbors testified at the trial about hearing the gunshots, but only one testified about hearing a car leave the scene after the gunshots.

Officers searched the home and found two handgun holsters and one handgun in Lee's room, as well as a rifle in Lee's truck. A GBI firearms examiner determined that the shooter used a .40-caliber Smith and Wesson. This weapon was never located, and there was no evidence that Lee owned a .40-caliber Smith and Wesson. Crime scene technicians performed gunshot residue tests and found no residue on Lee's hands. No fingerprints were found on the bullets.

On November 17, the morning after the shooting, George's employer went to the Young home, and Tia asked him to help her

find George's one-million-dollar life insurance policy, of which she was the primary beneficiary. Tia located the policy and notified the insurance company of George's death later that day.

That same day, Lee went to George's office building. He told one of George's co-workers that George had been shot and killed. The co-worker asked about the home's surveillance camera, and Lee replied that the camera was not working. Lee then asked the co-worker if he could continue to work for the security company as a subcontractor.

Later that same day, police officers asked Lee and Tia to go to the police station to speak with a detective, and they agreed. During Lee's interview, investigators questioned Lee about an individual going to the victim's vehicle after George was shot. Lee told officers that he was removing a tracking device that he had placed under George's car. Lee also said that George had asked Lee to buy the tracking device, and if anything happened to George, George wanted Lee to know where George's car was and to take the tracking device off. Lee did not provide evidence of this agreement with George, and

further, text messages between George and Lee introduced at trial contradicted the idea that George was aware of or consented to the tracking device on his car. Lee told the investigators that the tracking device was in his bedroom.

The evidence introduced at trial also showed that, while away from home on November 17, Tia called a friend who had come to the Young home after hearing of George's death. Tia asked the friend to find the cell phones belonging to both Tia and Lee and place the phones in Tia's room. The friend did not comply with this request. At trial, the friend testified that Tia apologized and explained that she made the request because one of Lee's texts would have made him seem violent. The friend testified that Tia did not give an explanation for why she also asked the friend to move her phone as well.

After the interviews, officers went to the Young home with a search warrant, seized the tracking device from Lee's bedroom, and subpoenaed records from the device. Officers also recovered cell phones from the home. Lee's phone revealed internet searches on

7

October 28, 2017, about poisonous snake or spider venom for sale. Lee's phone history also showed that on the night of the shooting, while officers were still on the scene, Lee looked up a different murder case and an article about the defendant in that case pleading guilty. Tia's phone revealed a meme that said: "The fortuneteller says your husband will meet a violent end. The lady responds, will I be convicted?" The cell phone also contained emails showing a romantic affair between Lee and Tia. Both Lee and Tia were arrested for George's murder.

1. Lee asserts that he received constitutionally ineffective assistance of counsel on the grounds that his counsel failed to object to (a) evidence of George's good character, (b) a photograph of George in life with his children, and (c) the introduction of and comment on Lee's post-*Miranda* silence.

To succeed on his claim of ineffective assistance, Lee must prove both that "his counsel's performance was professionally deficient and that he suffered prejudice as a result." *Washington v. State*, 313 Ga. 771, 773 (3) (873 SE2d 132) (2022). To show deficient

8

performance, Lee "must prove that his counsel acted or failed to act in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms." *Kennebrew v. State*, 299 Ga. 864, 868 (2) (792 SE2d 695) (2016). Lee bears the burden of overcoming the "strong presumption" that counsel performed reasonably. *Washington*, 313 Ga. at 773 (3) (citation and punctuation omitted). To show prejudice, Lee "must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Kennebrew*, 299 Ga. at 868 (2) (citation and punctuation omitted). Additionally, "there is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland v. Washington*, 466 U.S. 668, 697 (IV) (104 SCt 2052, 80 LE2d 674) (1984).

(a) Lee asserts that his trial counsel performed deficiently by failing to object to the State's evidence of, and repeated references

9

to, George's good character throughout the trial. We disagree.

At trial, the State introduced evidence regarding George's good character as part of its trial theme: "beloved became betrayed" when George, a "beloved" man, was betrayed and killed by Lee and Tia. Discussion of George's character began in the State's opening statement.[3] During the State's opening statement, Lee's counsel objected to references of George's good character, asserting that the State was being argumentative after the prosecutor said, "George has no enemies. George is beloved by all." The State responded that it was introducing what the evidence would show in this case. The trial court overruled the objection, but agreed to give a jury instruction that the State was speaking about what it anticipated the evidence would show.[4] Afterwards, Lee's counsel alleged during their opening statement that evidence would show that George led

---

[3] For example, the prosecutor stated, "George Young was beloved. There is hardly anybody who had a negative word to say about George Young. . . . This case is about an individual who was beloved. He had a work ethic that was unparalleled, not to be touched[.]"

[4] Lee does not assert this ruling as error on appeal.

a "double life," did "bad things," and had "some serious gambling problems." During the presentation of the evidence, the prosecution continued to discuss George's good character throughout the direct examination of the State's witnesses[5] and the cross-examination of Lee's witnesses[6] and referenced George's character in the State's closing argument.[7]

At the motion for new trial hearing, one of Lee's trial counsel testified that they did not consider the evidence at issue to be "good character" evidence "in the strictest sense under the evidence rule." Trial counsel continued that, even if this was good character evidence, the counsel team believed it to be a proper rebuttal of their strategy of questioning George's character to suggest that others may have had a motive to kill George because George had financial

---

[5] During the direct examination of George's employer, the prosecutor asked, "Were your customers satisfied with his work performance?" The employer replied, "Absolutely. There was a saying going around the office that everyone loved George[.]"

[6] During the cross-examination of another witness, the prosecutor asked if George was a hard worker, a good father, and a good husband, and the witness replied in the affirmative to each question.

[7] The prosecutor argued in closing: "Now, how did beloved, as I indicated to you all, become this, betrayed?" and "[George] . . . was an exceptionally hard worker, was an exceptionally good father, was an exceptional human being[.]"

issues and "serious gambling problems" and was possibly involved in gun-running. Additionally, trial counsel testified that "some of those objections would have been futile because at the end of the day when it went to the jury[,] the jury wasn't gonna determine who killed George Young based on how much he showed up to work" or based on "how good of a father or husband he was." As such, they focused their trial strategy on refuting the evidence about the tracking device, which they considered to be extremely damaging, and other possible suspects.

To establish deficient performance by his trial counsel, Lee must overcome a strong presumption that trial counsel's conduct "falls within the broad range of reasonable professional conduct" and demonstrate that his counsel "performed in an objectively unreasonable way, considering all circumstances and in the light of prevailing professional norms." *Smith v. State*, 296 Ga. 731, 733 (2) (770 SE2d 610) (2015) (citation and punctuation omitted). Moreover, "[t]rial tactics or strategy are almost never adequate grounds for finding trial counsel ineffective unless they are so patently

12

unreasonable that no competent attorney would have chosen them." *Watts v. State*, 308 Ga. 455, 460 (2) (841 SE2d 686) (2020) (citation and punctuation omitted). And "[t]he matter of when and how to raise objections is generally a matter of trial strategy." *Robinson v. State*, 278 Ga. 31, 36 (3) (c) (597 SE2d 386) (2004) (citation and punctuation omitted).

Here, trial counsel articulated that part of the defense strategy at trial involved questioning George's character to argue that others had the motive to shoot him and that they believed that the State would have been able to introduce evidence of George's good character in response. OCGA § 24-4-404 (a) (2) addresses when character evidence of the victim may be introduced in a criminal trial and allows "evidence of a pertinent trait of character of the alleged victim of the crime offered by an accused or by the prosecution to rebut the same" subject to limitations not relevant here. See also *Revere v. State*, 302 Ga. 44, 48-49 (2) (a) (805 SE2d 69) (2017) (Rule 404 (a) (2) requires that the "*defendant* first introduce evidence of a pertinent character trait of the victim . . . before the

13

State may introduce evidence to rebut that which was presented by the defendant" (emphasis in original)). Thus, trial counsel may have been able to object to some of the State's references to George's good character, which occurred before the defense introduced their character evidence. But we need not parse those issues here because we conclude that it fell within the wide range of reasonable professional conduct to forbear from objecting to the good character evidence, knowing that the State would eventually be able to introduce that evidence in rebuttal. See *Green v. State*, 291 Ga. 579, 580 (2) (731 SE2d 359) (2012) (reasonable trial strategy to forgo objecting when police officer testified to statements made by eyewitness when counsel knew that the eyewitness would also be testifying and he wanted to use the testimony to show inconsistencies in her statement); *Smith v. State*, 275 Ga. 326, 328 (3) (565 SE2d 453) (2002) (The attorney's decision not to object to "the detective's testimony, which was cumulative of other witnesses' testimony, and to the properly admitted public document was a legitimate trial strategy that falls within the range of reasonable

professional conduct."); *Woods v. State*, 271 Ga. 452, 454 (2) (c) (519 SE2d 918) (1999) (explaining that "there is no deficient performance when an attorney fails to object to admissible evidence"). This enumeration of error fails.

(b) Lee next asserts that his trial counsel rendered ineffective assistance by failing to object to the introduction and display of a photograph of George in life with his children. We are not persuaded.

After George's employer testified at trial that he knew George, Tia, and their three children, the State introduced a photograph of George standing with his three children. The picture was displayed on a screen visible to the jury for "at least an hour" while the State asked George's employer about details of George's work experience, as well as details about the night of the murder. The photograph also remained on display throughout Lee's cross-examination of George's employer and the State's re-direct.

Lee's trial counsel did not object to the display of the photograph during this time, but Tia's trial counsel did raise the issue with the trial judge afterwards, outside the presence of the

jury. He argued that the State had the exhibit displayed for "a full hour," well after the exhibit was identified and published to the jury, and asked that future pictures not be kept up for so long. The trial court agreed.

Lee argues that his trial counsel was deficient in failing to object to the introduction and display of this photograph because the photograph was highly prejudicial and improperly elicited sympathy from the jury. Lee further argues that the photograph was of low probative value since the State later introduced a picture of George alone and that only the photograph of George alone should have been admitted because the children were not victims in the shooting.

At the motion for new trial hearing, one of Lee's trial counsel testified that he did not object to the photograph of George with his children because the photograph "did not impact the means and the way" they had decided to represent Lee and again referenced the strategy to focus on explaining away Lee's actions with respect to the tracking device. His counsel also testified that he understood that the children were going to be part of this case regardless of the

photograph. Also, the jury was aware of George's relationship with his three children, two of whom testified at trial.

Assuming without deciding that trial counsel performed deficiently by not objecting to the introduction and display of the photograph, we determine that Lee has failed to show prejudice. Because the children were at home at the time of the shooting, two of the children were called as witnesses at trial, so the jury was aware of their existence and relationship with George. Further, the photograph was proffered during the testimony of a non-family member. See *Walker v. State*, 312 Ga. 232, 238 (3) (862 SE2d 285) (2021) (factors that help make a photograph of a victim in life less prejudicial include the victim being alone and the photograph being proffered through "witnesses other than the victim's relatives"). Also, due to the circumstances of this crime, the jury was well aware of the impact that the crime had on the children where their mother and a close family friend were on trial for murdering their father, so it is not clear that the photograph of George with his children elicited much additional improper sympathy, if any, from the jury.

For these reasons, we conclude that there is no reasonable probability that the trial result would have been different if not for the failure to object to the photograph. See *Ragan v. State*, 299 Ga. 828, 833 (3) (792 SE2d 342) (2016) (concluding there was harmless error where, independent of the photographs, the jury was "well aware" that the victim was both a wife and a mother); *Martin v. State*, 310 Ga. 658, 666-67 (5) (b) (ii) (852 SE2d 834) (2020) (photograph of victim holding his son was not overly prejudicial, as the son was also a victim in this case, and the jury was "well aware" of the son and "aspects of their relationship"). This enumeration of error fails.

(c) Lee next asserts that his trial counsel rendered ineffective assistance by failing to object to the improper presentation of and comments on Lee's post-*Miranda* silence. We disagree.

The record shows that Lee and Tia went to the police station on April 2, 2018, for additional interviews. The recording of Lee's interview shows that the detective read Lee his rights under

*Miranda,* although Lee was not under arrest at that time.[8]

The detective eventually showed Lee emails between Lee and Tia that revealed a romantic relationship between the two. After the detective told Lee that it was obvious that Lee and Tia were having some kind of relationship, Lee read the emails and paused without saying anything. Then, Lee requested counsel, and the detective terminated the interview.[9]

At trial, the State played the video recording of the interview for the jury, including the portion during which Lee remained silent after he was confronted with the emails, and cut off the video right before Lee requested an attorney. The State then examined the interviewing detective:

---

[8] The detective testified at the *Jackson-Denno* hearing that he did not read Lee his *Miranda* rights during previous interviews but did on April 2, 2018, because of "all of the follow up information and investigation" that had been done. See *Jackson v. Denno,* 378 U.S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

[9] Prior to trial, Lee's trial counsel filed a motion to suppress Lee's statements taken by police officers "on but not limited to November 17, 2017, and November 18, 2017." However, counsel did not raise Lee's "silence" from the April 2, 2018 interview in the motion to suppress or during the *Jackson-Denno* hearing. Following the hearing, the trial court denied Lee's motion to suppress.

Q: Really wasn't a good answer to that question that you posed to him, was it?
A: No, sir.
Q: There was a long pregnant pause, wasn't there?
A: Yes, sir.

Lee argues that his trial counsel performed deficiently in failing to ask for a redaction of his silence in the video[10] because invocation of his right to remain silent cannot be used against him. In addition, Lee argues that trial counsel was deficient in failing to object to the State's examination of the interviewing detective regarding his silence. See *Doyle v. Ohio*, 426 U.S. 610, 618 (II) (96 SCt 2240, 49 LE2d 91) (1976) (explaining that *Miranda* warnings carry an implicit assurance that silence will not carry a penalty).

Pretermitting whether these failures to object constituted deficient performance, Lee cannot show the requisite prejudice. First, evidence of the romantic affair between Lee and Tia was

---

[10] Before the trial began, the prosecutor informed the trial court that the State provided the defense with a copy of this interview, but removed the portion when Lee "invokes his right to remain silent, forward. And then when he invoked his right to an attorney as well. And then there's a whole long pause and we just deleted that Judge." It is unclear if this statement referred to the same silence by Lee that is at issue in this appeal.

introduced separately from the interview, so Lee's silence when confronted with the emails, to the extent that it can be considered a confirmation of the relationship and thus incriminating, was cumulative of other evidence introduced at trial. "The failure of trial counsel to object to such cumulative evidence does not support a claim of ineffective assistance of counsel." *Wilson v. State*, 297 Ga. 86, 88 (2) (772 SE2d 689) (2015).

Moreover, even without the recording of the interview and comment on Lee's silence while examining the emails, the evidence supporting Lee's guilt was substantial. George was found shot on the front porch lying on his back with his feet toward the door and his keys still in the lock, indicating that he was shot from inside the house, and Lee admitted that he was inside the house at the time of the shooting. In the minutes after George's death, Lee chose to remove a tracking device from George's car. Also, Lee's cell phone showed internet searches about poisonous venom and an article about a murder case. It is also undisputed that Lee and Tia were in a romantic relationship and that Tia called George's life insurance

21

company the day after George was killed regarding his one-million-dollar policy, which supplies a potential motive for the shooting. Because of the strength of this evidence, Lee cannot show that, but for counsel's deficient performance, there is a reasonable probability that the outcome of his trial would have been different. See *Moore v. State*, 278 Ga. 397, 400 (2) (a) (603 SE2d 228) (2004) (explaining that "strength of the circumstantial evidence" of the defendant's guilt is a factor in determining prejudice); *State v. Spratlin*, 305 Ga. 585, 595 (826 SE2d 36) (2019) (holding that, while failure to object to prosecutor's references to the defendant's post-*Miranda* silence was deficient performance, it was not sufficiently prejudicial in part because evidence of the defendant's guilt was "not weak").

2. Lee also asserts that the cumulative prejudice from his trial counsel's deficient performance entitles him to a new trial. We disagree.

To establish cumulative error, Lee "must show that . . . at least two errors were committed in the course of the trial" and that "considered together along with the entire record, the multiple

errors so infected the jury's deliberation that they denied the petitioner a fundamentally fair trial." See *State v. Lane*, 308 Ga. 10, 21 (4) (838 SE2d 808) (2020) (citation and punctuation omitted). Although we have assumed error with respect to two of Lee's ineffective assistance of counsel claims, we conclude that the cumulative prejudice from any assumed deficiencies is insufficient to show a reasonable probability that the results of the proceeding would have been different but for the alleged deficiencies. See *Jones v. State*, 305 Ga. 750, 757 (4) (e) (827 SE2d 879) (2019).

*Judgment affirmed. All the Justices concur.*