NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: June 21, 2023

S23A0228.  PERRYMAN-HENDERSON v. THE STATE.

PINSON, Justice.

Anthony Perryman-Henderson was convicted of malice murder and other crimes in connection with the shooting death of Tanaya Dunlap.[1] On appeal, Perryman-Henderson contends that (1) his trial

---

[1] The crimes occurred on June 13, 2017. On August 31, 2017, a DeKalb County grand jury indicted Perryman-Henderson for malice murder (Count 1), two counts of felony murder (Counts 2 and 4), two counts of aggravated assault (Counts 3 and 7—one against Dunlap and the other against Racquel Eagle), possession of a firearm by a convicted felon (Count 5), and possession of a firearm during the commission of a felony (Count 6). Perryman-Henderson was tried by a jury from July 8 to 15, 2019. The jury found Perryman-Henderson guilty of all counts. Perryman-Henderson was sentenced to serve life in prison with the possibility of parole on Count 1, five years in prison on Count 5 concurrent with Count 1, five years in prison on Count 6 consecutive to Count 1, and 15 years of probation on Count 7 consecutive to Count 1, resulting in a sentence of life plus five years in prison, followed by 15 years of probation. The remaining counts were merged or vacated by operation of law. Perryman-Henderson filed a motion for new trial, which he amended through new counsel on January 9, 2022. Following a hearing, the court denied the motion for new trial on July 29, 2022. Perryman-Henderson filed a timely notice of appeal. The case was docketed to the term of this Court beginning in December 2022 and submitted for a decision on the briefs.

counsel provided ineffective assistance by failing to "correct" the medical examiner's testimony about the range the fatal shot was fired from, and (2) the trial court committed plain error by commenting on the State's characterization of the medical examiner's range-of-fire testimony in a way that could be taken as endorsement of it. But Perryman-Henderson failed to establish that his defense counsel's relatively thorough cross-examination of the medical examiner, which elicited testimony favorable to Perryman-Henderson, fell outside the range of reasonable professional assistance. And even assuming the trial court's comment was error (an issue we do not decide), Perryman-Henderson has failed to establish that it was plain error because he has not shown how it affected his substantial rights—particularly given the evidence against him, which included eyewitness testimony that was not consistent with his version of events. So we affirm his convictions and sentence.

1. Early in the morning of June 13, 2017, Dunlap was fatally shot in the head after an argument with Perryman-Henderson, her

boyfriend, in a restaurant parking lot. The evidence presented at trial showed the following.

On the day before the shooting, Perryman-Henderson and Dunlap drove from Columbus, Georgia to the house where Perryman-Henderson's father, Robert Perryman, lived in DeKalb County. The three spent the evening drinking and "chilling." At some point, Perryman-Henderson and Perryman left to get more alcohol. While out of the house, Perryman-Henderson called his father's roommate, Stephen Lewis, and asked Lewis to "put [his phone] on the charger," in part because "the mother of my children used to send random text messages . . . when she know I was with Ms. Dunlap and I didn't want her to do that around that time and let [Dunlap] see it." The two returned to the house to continue drinking.

Early the next morning, Perryman-Henderson, Dunlap, and Perryman took a white car to a nearby restaurant to get something to eat. Perryman and Dunlap went inside the restaurant, leaving Perryman-Henderson in the back seat because he "wasn't coherent

3

at all." Shortly after arriving, Perryman went outside to check on his son and found him "passed out" in the back seat. While Perryman was returning to the restaurant, Dunlap walked out to the car. After about 13 minutes, Perryman left the restaurant again and then returned shortly with Dunlap. About five minutes later, Dunlap again left the restaurant and walked to the car.

Reshida Clark, who was in an SUV parked across from the white car, testified that she saw a man and a woman arguing in the car. The woman was saying, "let me go, let me go," and was trying to get out of the front seat. Clark testified that she "could barely see inside because the car was foggy," but "[o]nce [Dunlap] got out, she reached back in and grabbed something and that's when she was shot in the head." Immediately after the shot, Clark drove away from the parking lot. After a few minutes, Clark returned to try to administer medical aid. When she returned, Perryman-Henderson was pulling out of the parking lot in the white car and screaming, "[D]id anybody else want to be shot."

The State also introduced surveillance videos of the parking lot

4

and the restaurant's interior. The videos showed an SUV park across from a white car. Dunlap walked to the car and stayed there for several minutes. The videos then showed Dunlap falling to the ground. The SUV immediately pulled out of the parking lot, and a minute later, the white car looped through the parking lot and then left.[2]

According to the chief medical examiner for DeKalb County,

---

[2] Another eyewitness, Racquel Eagle, said she saw a couple arguing in the parking lot. A man—later identified as Perryman-Henderson—was sitting in the back seat of a white car, and a woman was trying to get out from the front seat of the car, but the man appeared to be reaching forward and holding onto the woman's hair. The woman then got back in the front seat. At that point, the man in the back seat pulled out a gun and shot the woman. Eagle then testified that she and her mother got out of their car because she thought "he's going to shoot us next." She said her mother ran down a hill away from the parking lot, while Eagle grabbed her baby to run, and that Perryman-Henderson exited the car, made eye contact with her, and said, "[Y]ou didn't see anything." Eagle said she begged for her life and turned her back to protect her baby, at which point Perryman-Henderson "pointed the gun at [her]." She said her mother returned to the parking lot, trying to distract Perryman-Henderson, who turned and pointed the gun at her mother, "going back and forth between the both of us." Eagle testified that a teenager then exited the restaurant, and Perryman-Henderson pointed the gun at her as well. Perryman-Henderson then drove around the parking lot, looking out the window, before leaving. The surveillance videos, which were played for the jury, do not appear to show Perryman-Henderson getting out of the car and pointing his gun at anyone, or anyone running down a hill. The videos do show two women running into the restaurant carrying two small children less than a minute after the white car left.

Dunlap was shot once on the left side of her head between her eyebrow and hairline. The shot was "at a straight line" with "no angulation." The medical examiner gave an "estimate" that, given the degree of stippling (abrasions from gunpowder particles) and absence of soot, Dunlap was "probably . . . 2 to 3 feet away from the muzzle of the gun" when she was shot. He added that soot might be deposited from a foot or "sometimes 15 inches" away, but "not very often any further than that." He also testified that soot can be washed away, including by blood, but stippling cannot. Finally, the medical examiner classified the death as a homicide. He explained that it was unlikely that Dunlap shot herself, because to produce the stipple pattern around her wound, she would have had to stretch her arm "all the way out" to its full length of 20 to 24 inches and then turn her hand around and pull the trigger.

Perryman-Henderson testified in his own defense. He said that he "passed out" at his father's house, then was asleep in the back seat of the white car, but did not know how he got there. While in the parking lot, he remembered Dunlap shaking him awake and

6

waving his phone in his face, talking about a text message before leaving. He fell back asleep before being woken up again by Dunlap, who slapped him. He recalled "grabbing her hair," and said that she grabbed his hair at the same time, but then let it go as she opened the car door. He then saw the front door open, and Dunlap reach in with a gun in her hand. Perryman-Henderson testified that he reached over and grabbed Dunlap's hand, "and I heard a gunshot go off." He said "[i]t was a struggle . . . it wasn't nothing intentional," and "we both had possession of [the gun]. I never had full possession of the gun." Perryman-Henderson then said his next memory was waking up later that morning in Columbus, with his phone "completely wiped clean." The white car and gun were never found.

2. Perryman-Henderson contends that his trial counsel provided ineffective assistance by failing to correct critical range-of-fire testimony by the medical examiner that counsel knew to be erroneous. He says that before trial, counsel learned that the range of fire was "anywhere from 1 to 3 feet," but he did not correct the medical examiner's "2 to 3 feet" estimate at trial.

7

To prevail on a claim for ineffective assistance, a defendant must show that his counsel's performance was professionally deficient and that he suffered prejudice as a result. See *Strickland v. Washington*, 466 U.S. 668, 687-694 (III) (A)-(B) (104 SCt 2052, 80 LE2d 674) (1984). We need not "address both components of the inquiry if the defendant makes an insufficient showing on one." *Lee v. State*, 314 Ga. 724, 727 (1) (879 SE2d 416) (2022) (citation and punctuation omitted).

To show that counsel performed deficiently, a defendant "must demonstrate that the lawyer performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms." *Washington v. State*, 313 Ga. 771, 773 (3) (873 SE2d 132) (2022) (citation and punctuation omitted). There is a "strong presumption that counsel performed reasonably," and a defendant must overcome the burden by showing "that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not." Id. (citation and punctuation omitted). In particular, "[d]ecisions regarding trial

8

tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." Id. (citation and punctuation omitted). "The scope of cross-examination is grounded in trial tactics and strategy, and will rarely constitute ineffective assistance of counsel." *Bonner v. State*, 314 Ga. 472, 476 (2) (877 SE2d 588) (2022) (citation and punctuation omitted). See also *Payne v. State*, 314 Ga. 322, 332 (3) (f) (877 SE2d 202) (2022) ("Decisions about what questions to ask on cross-examination are quintessential trial strategy and will rarely constitute ineffective assistance of counsel." (citation and punctuation omitted)). And "[d]ecisions about cross-examination do not amount to deficient performance unless they are so unreasonable that no competent attorney would have made them under similar circumstances." *Bonner*, 314 Ga. at 476 (2) (citation and punctuation omitted).

To show prejudice, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Evans v. State*, 315 Ga.

9

607, 611 (2) (b) (884 SE2d 334) (2023) (citation and punctuation omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Lee*, 314 Ga. at 727 (1) (citation and punctuation omitted).

Perryman-Henderson has not established that his trial counsel performed deficiently here with respect to the range-of-fire estimate. Trial counsel cross-examined the medical examiner about his range-of-fire estimate for some time. The medical examiner had testified that he estimated the gun was fired from two to three feet away from Dunlap because of the presence of stippling and absence of soot. But trial counsel was able to elicit from him that any soot could have been washed away or captured by Dunlap's hair (which was removed for the autopsy), which would make the possible range of fire closer. He was also able to elicit testimony that, given the caliber of the bullet, the gun used would have had less gunpowder and thus produced less soot than other guns. The medical examiner also repeatedly testified on cross-examination that the ranges he gave were estimates and not exact. In short, trial counsel elicited from

10

the medical examiner on cross-examination that the soot could have been washed away, and that the gun could have been fired from closer than two to three feet. Those acknowledgements were favorable to Perryman-Henderson's defense, and although Perryman-Henderson argues otherwise, the gist of the medical examiner's testimony at trial was not substantially different from his testimony at the motion-for-new-trial hearing, where he testified that he "couldn't rule [] out" that the gun could have been as close as 12 inches, but that "it's more likely that [the gun] was farther away [than 12 to 15 inches]." Perryman-Henderson has not shown that counsel's performance in cross-examining the medical examiner was "so unreasonable that no competent attorney" would have acted as he did. *Bonner*, 314 Ga. at 476 (2). This claim thus fails.

3. Perryman-Henderson contends that the trial court erred by commenting on the evidence. The following colloquy took place during the State's cross-examination of Perryman-Henderson:

> [THE STATE]: [The medical examiner] was here and he testified. You heard his testimony was based on the injury and the stippling that the weapon was at least 2 to 3 feet

11

away. You heard that testimony, right?

[DEFENSE COUNSEL]: Objection, your honor.

THE COURT: What's the objection?

[DEFENSE COUNSEL]: It's obvious they were inside the car. I mean do we—

THE COURT: No, no, no, no. What's the legal objection to the question?

[DEFENSE COUNSEL]: It's causing him to make a legal—

THE COURT: I don't think we are there yet. She just— she's asked a question about whether he heard the medical examiner's testimony about the—

[DEFENSE COUNSEL]: That was the estimate.

THE COURT: Okay.

[DEFENSE COUNSEL]: So, it wasn't—

THE COURT: Okay. The objection is overruled. That's the question right now.

Yes is the answer, he did hear the medical examiner testify that way.

Perryman-Henderson contends that during this colloquy the trial court's statement, "Yes is the answer, he did hear the medical examiner testify that way," impermissibly endorsed the State's characterization of the medical examiner's range-of-fire testimony as putting the gun "at least" two to three feet away from Dunlap. See OCGA § 17-8-57 (a) (1) ("It is error for any judge, during any phase of any criminal case, to express or intimate to the jury the judge's opinion as to whether a fact at issue has or has not been

12

proved or as to the guilt of the accused. . . .").

Because trial counsel did not object to the trial court's comment at trial, this claim is reviewed for plain error only. See id. § 17-8-57 (b) (alleged violations of subsection (a) (1) not objected to at trial are reviewed only for plain error, subject to an exception not relevant here). To show plain error, Perryman-Henderson must show that "(1) the alleged error was not affirmatively waived, (2) it was obvious beyond reasonable dispute, and (3) it affected the appellant's substantial rights, which ordinarily means showing that it affected the outcome of the trial." *Moore v. State*, 315 Ga. 263, 272-273 (4) (882 SE2d 227) (2022). If a defendant makes that showing, the appellate court has the discretion to remedy the error only if the error "seriously affected the fairness, integrity, or public reputation of judicial proceedings." Id. at 273 (4) (citation and punctuation omitted).

Assuming without deciding that the court's comment violated OCGA § 17-8-57, Perryman-Henderson has not established that this passing comment affected his substantial rights. See *Shaw v. State*,

292 Ga. 871, 873 (2) (742 SE2d 707) (2013) ("[P]lain-error analysis . . . requires the appellant to make an affirmative showing that the error probably did affect the outcome below." (citation and punctuation omitted)). Perryman-Henderson argues that the range-of-fire evidence was the only credible evidence that contradicted his testimony, and the court endorsed a characterization of this evidence that ruled out his version of events—that is, that Dunlap shot herself. But this argument significantly overstates the possible import of the court's comment. To begin with, the court's comment did not explicitly weigh in on the credibility of the expert or whether a particular fact had been proved—the court said only that "he did hear the medical examiner testify that way."[3] Moreover, Perryman-Henderson does not dispute that, although the medical examiner left open the possibility that the gun could have fired from 15 inches

---

[3] The court also later instructed the jury,

> By no ruling or comment that I have made during the progress of this trial have I intended to express opinion upon the facts of this case, the credibility of the witnesses, the evidence, or the guilt or innocence of the defendant. Your verdict should be a verdict based upon your opinion of the evidence according to the law that I have just given you in the charge.

14

away, the record shows that his consistent opinion based on the evidence was that it was probably fired from "2 to 3 feet"—a conclusion that still would have ruled out Dunlap having shot herself. And in any event, other evidence at trial beyond the range-of-fire testimony undermined Perryman-Henderson's story: An eyewitness whose testimony was corroborated in large part by surveillance video testified that she did not see a struggle over the gun like Perryman-Henderson claimed, and she heard him say, "[D]id anybody else want to be shot" right after Dunlap was shot. And the medical examiner also testified that, although he could not rule out a struggle, Dunlap had no injuries that would have indicated that she was in a struggle before she was shot. As a whole, the evidence of Perryman-Henderson's guilt was strong and inconsistent with Perryman-Henderson's version of events, which was that a mutual struggle in the car involving the gun caused the gun, held by Dunlap, to go off.

Given the above, Perryman-Henderson has not shown that the outcome of his trial probably would have been different had the jury

15

not heard the trial court's passing comment—in other words, that it would have affected his substantial rights. See *Merritt v. State*, 311 Ga. 875, 889 (6) (860 SE2d 455) (2021) (holding that the defendant failed to show the outcome of his trial would have been different had certain evidence been excluded when the State presented additional evidence that contradicted his defense). This claim therefore fails.

*Judgment affirmed. All the Justices concur.*