**FOURTH DIVISION**
**DILLARD, P. J.,**
**RICKMAN and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**October 26, 2023**

# In the Court of Appeals of Georgia

A23A0970. BONNER v. THE STATE

PIPKIN, Judge.

Following a bench trial, Appellant Renee Bonner was convicted of criminal attempt to commit a felony (murder), see OCGA § 16-4-1, and neglect of an elder person, see OCGA § 16-5-101. On appeal, Appellant claims that the evidence was insufficient to sustain her convictions and that trial counsel was ineffective. For the reasons that follow, we affirm.

It is well settled that

> [o]n appeal from a criminal conviction that follows a bench trial, the defendant no longer enjoys a presumption of innocence, and we view the evidence in a light favorable to the trial court's finding of guilt. We do not weigh the evidence or determine witness credibility but only determine whether the evidence is sufficient under the standard of *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

(Citation and punctuation omitted.) *Lute v. State*, 368 Ga. App. 70, 70-71 (889 SE2d 195) (2023). With this standard in mind, we review the evidence adduced at trial.

The victim in this case was born in 1935, and she is Appellant's mother. In late May 2017, Appellant, along with her sister and the victim, visited the victim's primary-care physician. At that appointment, the physician noted that he could do nothing further for the victim's on-going health problems; following a private discussion between the physician and Appellant -- who, at that time, was employed by a hospice agency in a non-medical position -- the physician recommended that the victim enter hospice care. The victim was subsequently admitted for at-home care with the agency at which Appellant was then employed. While going through the admission paperwork, Appellant -- acting as a representative of the victim -- signed a document reflecting that, in the event of an medical emergency, the victim did not want to be resuscitated, even though, only a couple of months earlier, the victim had herself signed an Advanced Health Directive indicating that she wanted all extraordinary efforts to be used to extend her life .

Initially, the victim was being housed and cared for by Appellant's sister, Paula. The first few weeks were unremarkable, and the Certified Nursing Assistance ("CNA") who tended to the victim on a daily basis testified that the victim was

2

"alert," "looked good," and was "well kept"; the victim never requested any type of medication, though the victim did have a prescription for Norco (hydrocodone). In fact, the trial court learned that, while the victim had a litany of health problems, the only pain medication she took was Tramadol and Tylenol.

On Thursday, June 22, 2017, Paula went out of town, and Appellant took over caring for the victim; Paula testified that the victim was "fine" before she left town. Following a nursing visit shortly after Paula's departure, the victim was prescribed liquid morphine, fentanyl patches, and diazepam tablets; the prescriptions for fentanyl and valium were dated 6/22/17, and the prescription for morphine was dated 6/23/2017. The morphine was to be administered at a rate of no more than 1 milliliter (mL) every two hours as needed for pain, the 50 microgram fentanyl patches were designed to be applied once every 72 hours, and 1-2 tablets of diazepam could be given every 4 hours as needed. Appellant was identified as the individual tasked with "medication management," and she was educated on the proper administration, dosing, and interactions of the drugs.

On Saturday afternoon, June 24, Appellant contacted Paula to report that the victim had "taken a turn for the worse," and Paula returned home the next day, finding her mother unresponsive. Appellant told other family members that the victim

3

was in kidney failure, and loved ones began gathering at Paula's residence. During this time, Appellant inquired as to whether the victim had life insurance and began making funeral arrangements. Family members would later testify that they observed Appellant repeatedly administer morphine to the unresponsive victim -- with some doses only minutes apart -- and that Appellant administered crushed pills to the unconscious victim, all while the victim was wearing a fentanyl patch. Appellant's own documentation -- which family members say failed to account for all the medication administered -- showed that Appellant was giving morphine more frequently than ordered and at times when the victim was "asleep."

When asked to let the hospice nurses administer medication, Appellant responded, "I'm their boss, I tell them what to do." Eventually, family members intervened, and Appellant was told to cease administering medication; a family member testified that, after Appellant stopped giving the victim medication, the victim seemingly "woke up." Following a number of verbal altercations between Appellant and her family -- which included Appellant challenging her family's decision to ask the hospice nurses about the kidney failure diagnosis -- Appellant eventually left the house.

At the request of the family, the county coroner -- who is also an emergency medical technician -- checked on the victim that Monday morning, and he was alarmed by her condition; he observed that she was unresponsive, had very shallow breathing, and had a respiration rate of only 4-5 breaths a minute. After discovering that both the vial of morphine and bottle of diazepam were empty, he encouraged the family to have the victim transported for emergency medical care. The victim presented in the emergency room with signs of opiate overdose and dehydration, but she improved once she came off the narcotics. Medical providers testified that the victim's kidney function was normal and that there was no evidence of kidney failure. The trial court learned that Appellant -- who had been educated by hospices nurses on the administration of the medications -- should not have been administering medication to an unconscious patient because the medication was prescribed *as needed* and because excessive administration of the medication could cause overdose or death.

The victim recovered and testified at trial. The victim told the trial court that she remembered very little of Appellant's stay but that, as soon as Paula left, Appellant's demeanor changed and that Appellant expressed resentment at having to care for her. According to the victim, she remembers being bathed by the CNA on the

5

day Paula left, and she remembers Appellant making her breakfast, which, the victim recounted, included unusual "knocking" noises for the preparation of coffee and toast. The victim testified that her next memory was waking up in the hospital.

After receiving this testimony and evidence, the trial court found Appellant guilty of criminal attempt to commit a felony (murder) and neglect of an elder person; the trial court later denied Appellant's motion for new trial as amended.

1. In her first enumeration, Appellant asserts that the evidence was insufficient to sustain her convictions. We disagree.

a. We first turn to Appellant's conviction for criminal attempt to commit murder. "A person commits the offense of criminal attempt when, with intent to commit a specific crime, he performs any act which constitutes a substantial step toward the commission of that crime." OCGA § 16-4-1. This offense "consists of three elements: first, the intent to commit the crime; second, the performance of some overt act towards the commission of the crime; and third, a failure to consummate its commission." *Wittschen v. State*, 259 Ga. 448, 448 (1) (383 SE2d 885) (1989). With respect to the underlying crime, "[a] person commits the offense of murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being." OCGA § 16-5-1 (a). "Express malice is that deliberate

6

intention unlawfully to take the life of another human being which is manifested by external circumstances capable of proof. Malice shall be implied where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart." Id. at (b).

Obviously the alleged attempt on the victim's life was unsuccessful, and Appellant acknowledges that the State presented evidence "that may support a finding that [Appellant] administered too much medication."[1] Thus, the sole remaining question is whether there was intent to commit the crime of murder. "A person will not be presumed to act with criminal intention but the trier of facts may find such intention upon consideration of the words, conduct, demeanor, motive, and all other circumstances connected with the act for which the accused is prosecuted." OCGA § 16-2-6. Ultimately, it was for the fact finder to decide, from the facts and circumstances, whether Appellant acted intentionally and with malice. See *McGuire v. State*, 307 Ga. 500, 504 (837 SE2d 339) (2019). Here, the fact finder was not, as Appellant asserts, obliged to conclude that she acted only negligently or recklessly. Instead, the evidence shows that Appellant expressed contempt for the victim from

---

[1] The indictment charged that the "substantial step toward the commission of the crime" was Appellant's "administering fentanyl patches to [the victim] and repeatedly administering excessive amounts of morphine."

the moment her care began; that she lied to family members about the victim's condition and then challenged them when they sought information from the hospice nurses; that she continually administered excessive doses of numerous sedating and narcotic medications to her unresponsive mother until her family insisted that she stop; and, finally, that Appellant inquired as to whether the victim had life insurance and then attempted to make funeral arrangements while the victim was still living. While Appellant points to substantial conflicting evidence and suggests that she was merely following the lawful orders of medical professionals, the trier of fact was authorized to discount such an interpretation of the evidence and conclude that Appellant acted with intent and malice.

b. We next turn to Appellant's conviction for neglect of an elder person. The relevant statute provides as follows:

> A guardian or other person supervising the welfare of or having immediate charge, control, or custody of a . . . elder person . . . commits the offense of neglect to a . . . elder person . . . when the person willfully deprives a . . . elder person . . . of health care, shelter, or necessary sustenance to the extent that the health or well-being of such person is jeopardized.

OCGA § 16-5-101 (a). As used in this provision, "'[e]lder [p]erson' means a person 65 years of age or older." OCGA § 16-5-100 (4). Here, the indictment accuses

8

Appellant of violating this provision by "failing to provide water and food" to the victim.

At trial, the fact finder learned from family members that, in the time leading up to her hospital admission, the victim's lips were unusually "dry and cracked" and that the only hydration she had received was from a sponge being placed on her lips. Further, medical professionals testified that the victim "was very dehydrated" when she arrived at the hospital and required medical treatment for the condition. Accordingly, the evidence was sufficient to sustain this conviction.

2. In her second enumeration, Appellant contends that trial counsel was ineffective for failing to assert immunity pursuant to OCGA § 31-9-2 (d) (1). This argument is without merit.

To succeed on her claim, Appellant must demonstrate both that trial counsel's performance was deficient and that she suffered prejudice as a result of counsel's deficient performance. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). "To prove deficient performance, Appellant must show that [her] lawyer performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (3) (745 SE2d 637) (2013). As to prejudice, Appellant "must

9

demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Lee v. State*, 314 Ga. 724, 727 (1) (879 SE2d 416) (2022) "[S]atisfaction of this test is a difficult endeavor." *Davis v. State*, 306 Ga. 140, 144 (3) (829 SE2d 321) (2019). And "[i]f an appellant is unable to satisfy one prong of the *Strickland* test, it is not incumbent upon [the reviewing court] to examine the other prong." (Citation and punctuation omitted.) Id. at 143 (3).

Appellant claims that trial counsel should have asserted that Appellant was entitled to immunity under OCGA § 31-9-2 (d) (1), which states as follows:

> No hospital or other health care facility, health care provider, or other person or entity shall be subject to civil or criminal liability or discipline for unprofessional conduct solely for relying in good faith on any direction or decision by any person reasonably believed to be authorized and empowered to consent under subsection (a)[2] of this Code section even if death or injury to the patient ensues. Each hospital or other health care facility, health care provider, and any other person or entity who acts in good faith reliance on any such direction or decision shall be protected and released to the same extent as though such person had interacted directly with the patient as a fully competent person.

---

[2] Subsection (a) establishes that individuals on their own behalf or, in some cases, certain third-parties, may give consent to medical treatment. OCGA § 31-9-2 (a).

10

According to Appellant, "[t]his code section means that [she] was protected from criminal prosecution for her actions since [the victim] or another lawfully authorized person . . . consented to her placement into hospice care and the [subsequent] medical treatment." Appellant has misapprehended the scope of this statute.

While there may be little case law interpreting this provision, it is clear from its plain language that any "immunity" arising from this statute pertains only to the issue of *consent* to medical treatment or procedures. The statute expressly concerns those "relying in good faith on any direction or decision by any person reasonably believed to be authorized and empowered *to consent*." (Emphasis supplied.) OCGA § 31-9-2 (d) (1). Here, there is no question that the victim -- either individually or through a representative -- duly consented to being cared for by the hospice agency, and Appellant was not accused of some type of battery based on lack of consent. Cf. *Smith v. Luckett*, 155 Ga. App. 640, 640 (1) (271 SE2d 891) (1980) (physician entitled to immunity on civil claim for battery where evidence showed that wife consented to medical treatment for husband). Thus, any immunity created by OCGA § 31-9-2 (d) (1) has no application here, and "trial counsel was not deficient in failing to pursue a meritless course of action." *Tyson v. State*, 312 Ga. 585, 602 (6) (f) (864 SE2d 44) (2021).

Alternatively, assuming that this provision has any relevance here -- which is doubtful -- this statute concerns consent to "*medical treatment or procedures not prohibited by law*." (Emphasis supplied.) OCGA § 31-9-2 (a). The evidence here does not demand a finding that Appellant was administering lawful medical treatment. Indeed, the trial court's verdict necessarily reflects that it rejected any claim that Appellant was engaged in some type of medical care, and, as the trial court explained in its order denying Appellant's motion for new trial, such a conclusion would have been fatal to this defense as well. See *Lee v. State*, 300 Ga. App. 214, 217 (1) (684 SE2d 348) (2009) (noting that any defense available under OCGA § 31-9-2 was not available where conduct was not done "as part of a medical treatment or procedure but for some other reason"). Accordingly, there is no merit to this enumeration.

For these reasons, the judgments of conviction are affirmed.

*Judgment affirmed. Dillard, P. J., and Rickman, J., concur.*