### S16A0844. KENNEBREW v. THE STATE.
(792 SE2d 695)

NAHMIAS, Justice.

Appellant Phillip Kennebrew was found guilty of malice murder, armed robbery, and other crimes in connection with the death of Breyon Alexander. In *Babbage v. State*, 296 Ga. 364 (768 SE2d 461) (2015), we affirmed the convictions of Mason Babbage and Samuel Hall, who were tried together with Appellant, rejecting their claims of ineffective assistance of counsel. However, each defendant had his

---

own attorney at trial, and Appellant — unlike Babbage and Hall — has shown that his trial counsel was professionally deficient in two significant respects and that, but for those errors, there is a reasonable probability that the result of the trial would have been more favorable to him. Accordingly, we reverse Appellant's convictions, although we find that the evidence presented at trial was legally sufficient to support the convictions, so the State may retry him if it chooses.[1]

1. As explained in *Babbage*, when viewed in the light most favorable to the verdicts, the evidence at trial showed the following.

> Around midday on October 18, 2011, Marvin Evans heard a loud noise from the back of his second floor DeKalb County apartment. From his balcony, Evans observed a white Chevrolet Malibu with its back side facing the apartment building. Evans saw two light-skinned black men, one beside the car and the other, whose hair was worn in dreadlocks, running toward the car. Proceeding downstairs to investigate, Evans passed a bald, light-skinned black man coming up the stairs. At trial, Evans identified Hall as the man he passed on the stairs.
>
> In the downstairs apartment, Evans discovered the victim hogtied and bleeding, with several teeth knocked out of his mouth. The apartment had been ransacked. Evans called 911. Though conscious when Evans discovered him, the victim died from his injuries soon thereafter. His injuries included both blunt and sharp force injuries, consistent with having been stabbed and beaten with the butt of a gun. A knife was found in the apartment's patio area.
>
> There were no signs of forced entry into the apartment, from which numerous items of electronic equipment, firearms, and a large sum of cash had been taken. Among the

---

[1] The crimes occurred on October 18, 2011. On December 20, 2011, a DeKalb County grand jury indicted Appellant, Babbage, and Hall for malice murder, felony murder, aggravated assault, armed robbery, false imprisonment, and possession of a knife during the commission of a felony; Hall faced two firearm charges in addition. At a trial from August 13-17, 2012, the jury found the three defendants guilty of all charges. On September 11, 2012, the trial court sentenced Appellant to serve life in prison for malice murder and consecutive terms of twenty years for armed robbery and five years for the knife offense, as well as a concurrent term of ten years for false imprisonment; the felony murder verdict was vacated by operation of law, and the aggravated assault verdict merged. On September 14, 2012, Appellant filed a motion for new trial, which he amended with new counsel on December 1, 2014. After an evidentiary hearing on December 16, 2014, the trial court denied the motion on February 4, 2015. Appellant filed a timely notice of appeal, and the case was docketed in this Court for the April 2016 term and orally argued on May 10, 2016.

stolen items were a 50-inch flat screen television, a 42-inch television, a 12-gauge shotgun, two laptop computers, two Playstation gaming systems, an Xbox gaming system, a .40 caliber Smith and Wesson handgun, two .380 caliber handguns, and three other guns. The victim's roommate testified that the victim sold drugs from their apartment and for this reason was always careful about whom he allowed inside.

As of the time of the crimes, Babbage had known the victim for six to seven years. Babbage had stayed in the victim's apartment the week prior to the crimes, had been in the apartment many times, and knew that there were guns, money, and marijuana there. Babbage had sold a 50-inch TV to the victim a few weeks prior, and there was testimony that Babbage had recently demanded the victim sell it back, a demand the victim had refused. A search of Babbage's home uncovered a pair of black pants, identified as belonging to Babbage, bearing blood stains matched to the victim and DNA matched to Babbage. Babbage's wife owned a white Chevrolet Malibu, and there was evidence that Babbage had driven that vehicle on the morning of the crimes. A search of the Malibu uncovered fingerprints on the exterior of the front passenger side door belonging to Hall, a friend of Babbage.

Hall's girlfriend, Erin Tew, testified that, on the day before the crimes, she had overheard a telephone conversation on speaker phone between Hall and Babbage, in which they discussed "hitting a lick" on a man who had molested Babbage's niece and who had guns and drugs. The State established that, at the time of the murder, the victim was under indictment for child molestation.

A search of the home Hall shared with his girlfriend uncovered a 12-gauge shotgun, a .380 caliber handgun, 12-gauge shotgun shells, and .38 caliber live rounds. In the backyard of the home, investigators also discovered a makeshift barbeque grill containing ashes and charred clothing remnants. The son and daughter of Hall's girlfriend, who also lived in the home, testified that when they returned home from school on the day of the crimes, Hall, Babbage, and an unknown third man had "cool" electronic equipment at the house, which Babbage loaded into his car the following day. They also testified that on the same day Babbage and Hall had cut off their hair and all three men had used the backyard grill to burn clothing.

Tew testified that, on the day of the crimes, she received two text messages from Hall, the first stating, "I think we f**ked up," and the second stating, "I think we killed somebody." Immediately thereafter, she received electronic photographs showing a sink full of dreadlocks and Hall, who, though previously having worn dreadlocks and full facial hair, was now bald and clean-shaven. On the evening of the crimes, Tew testified, Hall told her that "it wasn't even worth it" and that "he didn't even get anything."

A cigarette butt recovered from the victim's apartment was determined to bear the DNA of [Appellant]. [Appellant's] girlfriend testified that, on the morning of the crimes, she had driven [Appellant] to meet Babbage, who was driving a white Chevrolet. [Appellant's] girlfriend also testified that when she saw him later that day he was wearing different clothes than he had been wearing in the morning. During the investigation, a search uncovered live .40 caliber Smith and Wesson rounds and 12-gauge shotgun rounds, as well as a knife, in backpacks belonging to [Appellant].

Cell phone records revealed that, on the day of the crimes, 15 separate text or voice communications took place between Babbage's cell phone and Hall's cell phone. Six of these communications, which occurred during a 36-minute period around the time of the crimes, were transmitted via the cell tower servicing the area of the victim's apartment. The phone records also showed seven communications between Babbage's cell phone and [Appellant's] cell phone from that morning.

*Babbage*, 296 Ga. at 364-366.

When viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes for which he was found guilty. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979); *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) (" 'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.' " (citation omitted)). See also OCGA § 16-2-20 (defining parties to a crime); *Charleston v. State*, 292 Ga. 678, 680-681 (743 SE2d 1) (2013) (explaining that participation in a crime may be inferred from association prior to, during, and after the crime). We note with respect to the discussion in Division 2 below that in determining the legal sufficiency of the evidence, we consider all of the evidence that was admitted at Appellant's trial, even though some

of the evidence should have been excluded. See *Cowart v. State*, 294 Ga. 333, 343 (751 SE2d 399) (2013). See also *McDaniel v. Brown*, 558 U. S. 120, 131 (130 SCt 665, 175 LE2d 582) (2010) (" '[A] reviewing court must consider all of the evidence admitted by the trial court,' regardless of whether that evidence was admitted erroneously." (citation omitted)).

2. Appellant contends that his trial counsel, Maurice Kenner, provided constitutionally ineffective assistance of counsel. To prevail on this claim, Appellant must show both deficient performance by counsel and resulting prejudice. See *Strickland v. Washington*, 466 U. S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To show deficient performance, Appellant must prove that his counsel acted or failed to act in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. See id. at 687-690. To show resulting prejudice, Appellant must demonstrate that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

(a) Appellant identifies two omissions by Kenner that he contends were not the result of reasonable professional judgment. We agree.

(1) Appellant points first to Kenner's failure to seek suppression of the evidence recovered from Appellant's backpacks. Appellant's DNA was found on a cigarette butt at the crime scene, and this evidence, along with witness testimony, clearly placed Appellant at the victim's apartment at the time of the crimes. Given this evidence, Kenner, in consultation with Appellant, decided to pursue a mere presence/mere association defense, arguing at trial that Appellant went to the apartment with Babbage and Hall simply to sell the victim a PlayStation, that Hall unexpectedly went crazy and viciously beat and stabbed the victim to death, and that Appellant then fled the apartment.

This defense had its weaknesses — Appellant was associated with Babbage during the morning before the crimes, was present with Babbage and Hall during the murder, and (inferentially) was the third man present with Babbage and Hall and apparent robbery proceeds later in the day at Hall's house. See *Charleston*, 292 Ga. at 680-681. But the death knell for this defense (and likely any other defense) was evidence that Appellant not only was with Babbage and Hall during the crimes, but also possessed a weapon potentially used in assaulting the victim and items stolen from the victim. And the only evidence of that came from two backpacks that the police seized from the college dorm room of Appellant's girlfriend two days after the crimes, when the police went there with an arrest warrant for Appellant and placed him under arrest.

Critically, the police seized the backpacks only after Appellant had been handcuffed and removed from the room. The police then waited another six days before searching the backpacks — opening them and finding the evidence that was admitted against Appellant at trial. That evidence consisted of: (1) a holstered knife that had no traces of blood on it but that the State suggested had been used in the stabbing of the victim; and (2) proceeds of the robbery — four 12-gauge shotgun shells comparable to the 12-gauge shotgun shells recovered from co-defendant Hall's house that were taken from the victim's apartment, as well as about 16 Smith & Wesson .40-caliber bullets of the same type taken from the victim's apartment.[2] The State emphasized this evidence in closing argument, telling the jury that it proved that Appellant was a participant in the crimes rather than merely present.

Despite the failure of the police to obtain a warrant to open and search through the backpacks and the damning nature of this evidence, Kenner did not pursue its suppression.[3] At the motion for new trial hearing, Kenner's only explanation for failing to seek suppression was based on the exception to the Fourth Amendment's warrant requirement for a search incident to a lawful custodial arrest. That is also the only authority for the search that the State has offered. But that exception clearly did not authorize this search.

As the United States Supreme Court explained three years before the trial of this case in *Arizona v. Gant*, 556 U. S. 332 (129 SCt 1710, 173 LE2d 485) (2009):

> The exception derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations. See *United States v. Robinson*, 414 U. S. 218, 230-234, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Chimel [v. California]*, 395 U. S. [752], 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 [(1969)]. In *Chimel*, we held that a search incident to arrest may only include "the arrestee's person and the area

---

[2] Apparently no bullets of this type were recovered from Hall's house.

[3] Kenner filed a "preliminary," boilerplate motion to suppress "all evidence illegally seized by the prosecution including physical evidence," but he never amended the motion to identify any specific items or grounds for suppression and never sought a hearing or ruling on the motion. The *seizure* of the backpacks may have been lawful based on the consent that Appellant's girlfriend apparently gave the police to search her dorm room and take items that were identified as belonging to Appellant, but her consent could not authorize the police to *search* a closed container that the police knew belonged to someone else. See *Brown v. State*, 288 Ga. 404, 406-407 (703 SE2d 624) (2010); *State v. Stevens*, 269 Ga. App. 769, 769-770 (605 SE2d 406) (2004) (upholding the suppression of marijuana found in the defendant's backpack during a consent search of his girlfriend's apartment). See generally 4 Wayne R. LaFave, Search and Seizure § 8.5 (d), at n. 110 (5th ed. updated Oct. 2016).

'within his immediate control' — construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." Ibid. That limitation, which continues to define the boundaries of the exception, ensures that the scope of a search incident to arrest is commensurate with its purposes of protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy. See ibid. (noting that searches incident to arrest are reasonable "*in order to* remove any weapons [the arrestee] might seek to use" and "*in order to prevent* [the] concealment or destruction" of evidence (emphasis added)). If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply. E.g., *Preston v. United States*, 376 U. S. 364, 367-368, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964).

*Gant*, 556 U. S. at 338-339.

Although the Supreme Court's decisions have vacillated to some extent on the scope of the exception in the context of persons arrested in vehicles, see *Gant*, 556 U. S. at 339-351, it has been settled law for decades that in other contexts — like the arrest of a person in a residence — the police may search only the arrestee's person, personal property immediately associated with his person (like a cigarette pack in his pocket), and the area within his reaching distance. See *Robinson*, 414 U. S. at 235-236; *Chimel*, 395 U. S. at 763. See also *Riley v. California*, 573 U. S. ___ (134 SCt 2473, 2483-2484, 189 LE2d 430) (2014) (reviewing the Supreme Court's decisions in this area). Indeed, as the Court once explained in terms directly applicable to this case:

> [W]arrantless searches of luggage or other property seized at the time of an arrest cannot be justified as incident to that arrest either if the "search is remote in time or place from the arrest," or no exigency exists. Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest.

*United States v. Chadwick*, 433 U. S. 1, 15 (97 SCt 2476, 53 LE2d 538)

(1977) (citation and footnote omitted). See also *Satterfield v. State*, 256 Ga. 593, 597 (351 SE2d 625) (1987) (holding that the seizure of a shotgun that the police found while searching a house a few minutes after the defendant and his girlfriend were removed and put into police cars could not be justified as a search incident to his arrest).

In this case, Appellant had already been handcuffed and removed from the dorm room when the police seized his backpacks, and they were not searched until six days later, far away in both time and place from Appellant's arrest. There was no danger whatsoever that Appellant might gain access to the property at that point to seize a weapon or destroy evidence, and thus the search of the backpacks was clearly not an incident of Appellant's arrest. Kenner's failure to pursue suppression of the evidence found in the backpacks based on his misunderstanding of the search incident to arrest doctrine was deficient performance under *Strickland*. See *Williams v. State*, 284 Ga. 849, 851 (672 SE2d 619) (2009) ("In order to establish deficient performance based on the failure to seek suppression of evidence, a defendant must show that he or she had a meritorious Fourth Amendment claim." (footnote omitted)); *Benham v. State*, 277 Ga. 516, 517-518 (591 SE2d 824) (2004) ("In failing to adequately research and understand the defenses available to her client, defense counsel rendered assistance that fell below the minimum standard set forth in *Strickland*, supra.").

The State argues that Kenner was not professionally deficient because, had he done research on the issue, he reasonably could have decided not to seek suppression based on this Court's decision in *Wright v. State*, 276 Ga. 454 (579 SE2d 214) (2003), which the State describes as "a case that is factually indistinguishable from this one." This argument is meritless. In *Wright*, the police arrested the defendant at a friend's house and seized a duffle bag from the floor of the bedroom in which the arrest took place. See id. at 459-460. The opinion does not specify the location of the bag in relation to the defendant's reach at the time of the seizure. But in any event, *Wright* addressed only the asserted *statutory* basis for the seizure and search of the duffle bag, not their *constitutionality*, briefly discussing only statutory text and citing not a single Fourth Amendment case. See id. at 460. Moreover, the statute in question, OCGA § 17-5-1, was enacted by the General Assembly in 1966 — before the controlling decisions of the United States Supreme Court and this Court on the scope of the constitutional search incident to arrest exception. Thus, while *Wright* may appear *factually* similar to this case, its holding does not control the *legal* issue presented here. Whether or not OCGA § 17-5-1 was violated by the seizure and search of Appellant's backpacks is not the

issue, as it is clear that they could not be constitutionally searched as an incident of his arrest.

(2) Appellant also points to Kenner's failure to object when the prosecutor blatantly commented on Appellant's pre-arrest silence during the State's closing argument. Kenner argued in closing that Appellant went to the victim's apartment only to sell the victim a video game system and did not participate in the murder and robbery that ensued. In rebuttal, the prosecutor argued:

> If he was there and he had nothing to do with it and he saw everything, then why in the good gracious name did he not go immediately out and call somebody, the police, the sheriff's office, someone? You'll have the [cell phone] records back there. You heard the detective, and I'll ask you to do the same thing, look at [October] 18th. Is there one 911 call? Zip. And he had to be arrested two days later.

The prosecutor then made a similar argument regarding both Babbage and Appellant:

> Check [Babbage's] numbers. If he was there, had nothing to do with it, wouldn't you think before, during, after, wouldn't you think if he was running and if [Appellant] was running to get away from that, that the very first thing they would have done would have been call the cop and said, look, we just left a guy back at 1220 — 1202 that killed a man in that apartment, and we want to tell you what happened. By golly, get over there and arrest him. Check the [phone] records before, during, after.

Under Georgia's old Evidence Code, which governed the trial of this case, this Court had established a bright-line rule prohibiting the State from commenting on a defendant's pre-arrest silence or failure to come forward, on the ground that such comments were "far more prejudicial than probative." *Mallory v. State*, 261 Ga. 625, 630 (409 SE2d 839) (1991).[4] The State clearly violated the *Mallory* rule in this case — indeed, it is hard to imagine a clearer violation. See, e.g., *Collins v. State*, 289 Ga. 666, 667-668 (715 SE2d 136) (2011); *Reynolds*

---

[4] *Mallory* was overruled on other grounds in *Clark v. State*, 271 Ga. 6, 9-10 (515 SE2d 155) (1999). We reiterate that *Mallory* was not decided on constitutional grounds but rather was based on former OCGA § 24-3-36. See *Mallory*, 261 Ga. at 630. We express no opinion about the continuing validity of *Mallory*'s evidentiary ruling under the new Evidence Code. See *Simmons v. State*, 299 Ga. 370, 374 (788 SE2d 494) (2016).

*v. State*, 285 Ga. 70, 71-72 (673 SE2d 854) (2009). See also *State v. Sims*, 296 Ga. 465, 469 (769 SE2d 62) (2015) ("[T]he comments expressly emphasize that [the defendant] failed to call police . . . prior to being arrested. This violated the bright-line rule of *Mallory.*"); *Cheeks v. State*, 325 Ga. App. 367, 368 (750 SE2d 753) (2013) (finding improper the State's argument in closing, " 'You didn't do anything wrong? Go down and talk to the police. Tell them what happened.' ").[5]

Nevertheless, Kenner did not object or move for a mistrial. At the motion for new trial hearing, Kenner testified that he did not recall why he failed to object to the improper comments, but if he had to guess, it was "probably because [he] did not want to bring any more attention to the State's closing argument." The State's discussion of Appellant's failure to come forward to the police was not, however, just a passing or equivocal remark that the jury might have overlooked. It was a specific, extended argument aimed directly at demonstrating Appellant's guilt. Given Appellant's defense theory, the importance of the State's silence-equals-guilt argument to its case against him, and the obviousness of the *Mallory* violation, Kenner's failure to object was patently unreasonable and thus deficient performance under *Strickland*. See, e.g., *Sims*, 296 Ga. at 469; *Thomas v. State*, 284 Ga. 647, 649 (670 SE2d 421) (2008); *Lampley v. State*, 284 Ga. 37, 38-39 (663 SE2d 184) (2008).

(b) As mentioned earlier, to prevail on his ineffective assistance claim, Appellant must show not only deficient performance by his trial counsel, but also "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," which means "a probability sufficient to undermine confidence in the outcome" of his trial. *Strickland*, 466 U. S. at 694. In deciding whether the required prejudice has been shown, we must consider the combined effect of all of counsel's unprofessional errors. See *Schofield v. Holsey*, 281 Ga. 809, 811 n. 1 (642 SE2d 56) (2007) ("The Supreme Court of the United States has held that it is the prejudice arising from 'counsel's errors' that is constitutionally relevant, not that each individual error by counsel should be considered in a vacuum." (citing *Strickland*, 466 U. S. at 687)).

Thus, in determining whether Appellant has satisfied this prejudice standard, we consider the effect of Kenner's two errors not in isolation but in combination, reviewing the record de novo and weighing the evidence as we would expect reasonable jurors would

---

[5] Appellant did not testify at trial, and there was no evidence presented that he ever made a statement to the police. Thus, there could be no argument that the prosecutor was merely pointing out inconsistencies or omissions in his trial and pretrial explanations. See *Sims*, 296 Ga. at 469 (distinguishing such cases).

have done. See *Woodard v. State*, 296 Ga. 803, 810 n. 5 (771 SE2d 362) (2015). Applying these principles, although the question of prejudice is closer than the question of deficient performance, we conclude that Appellant has shown the prejudice needed to prevail on his claim.

The 12-gauge shotgun shells, .40-caliber Smith & Wesson bullets, and knife that the police found in the unconstitutional search of Appellant's backpacks were important to the State's effort to prove that he participated in the crimes and was not merely present when the murder occurred. This was demonstrated by the State's focus on this evidence in its closing argument, where the prosecutor emphasized that Appellant was "the one with the .40 calibers. He's the one with the shotgun shells that are the same as the shells in Sammy Hall's house. He's the one that has the knife." The jury then sent two notes to the court during deliberations, first asking for the shotgun shells found in Appellant's backpack and the shotgun shells found at Hall's residence, presumably for comparison, and then asking for the .40-caliber bullets from the backpack and "any handgun shells from Hall[']s house," also presumably for comparison. In addition, the State tried to supplement its evidence by improperly arguing that Appellant's guilt was proved by his not volunteering his defense to the police before his arrest.

The other evidence connecting Appellant to the commission of the crimes was not overwhelming, and the defense offered a plausible alternative explanation for why Appellant was with Babbage and Hall at the victim's apartment. In sum, Appellant has shown enough prejudice to undermine our confidence in the outcome of the trial as to him.

(c) Accordingly, we conclude that Appellant has carried his burden to show that his trial counsel provided ineffective assistance as defined in *Strickland*. His convictions must therefore be reversed, although the State may choose to retry him. See *Fisher v. State*, 299 Ga. 478, 489 (788 SE2d 757) (2016).

*Judgment reversed. All the Justices concur.*

DECIDED OCTOBER 31, 2016.

*Kevin A. Anderson, Tyler R. Conklin*, for appellant.

*Robert D. James, Jr., District Attorney, Charles A. Spahos, Gary D. Bergman, Lalaine A. Briones, Assistant District Attorneys pro tempore; Samuel S. Olens, Attorney General, Patricia B. Attaway*

*Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant
Attorney General, Matthew B. Crowder, Assistant Attorney General,
for appellee.*