NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: September 19, 2023

S23A0530.  KENNEBREW v. THE STATE

COLVIN, Justice.

Following a reversal of his convictions on appeal and a retrial, Appellant Phillip Kennebrew was convicted of malice murder and related crimes in connection with the October 2011 beating and stabbing death of Breyon Alexander.[1]  On appeal, Appellant argues

---

[1] This is the third time Appellant has appeared before this Court concerning these criminal proceedings against him.  The crimes occurred on October 18, 2011, and Alexander died the next day.  On December 20, 2011, a DeKalb County grand jury indicted Appellant, Mason Babbage, and Samuel Hall for malice murder (Count 1), felony murder (Count 2), aggravated assault (Count 3), armed robbery (Count 4), false imprisonment (Count 5), and possession of a knife during the commission of a felony (Count 8).  Hall was also charged with possession of a firearm during the commission of a felony (Count 6) and possession of a firearm by a convicted felon (Count 7).  Appellant was jointly tried with Babbage and Hall from August 13 through 17, 2012.  The jury found the three defendants guilty of all counts.  After sentencing and the denial of his motion for new trial, Appellant filed his first appeal to this Court.

On October 31, 2016, we reversed Appellant's convictions on the ground that he received constitutionally ineffective assistance of trial counsel based on counsel's failure to object to an improper argument made by the State in closing arguments and counsel's failure to seek suppression of evidence

that the trial court erred in allowing the State to introduce into evidence testimony from a witness who testified at Appellant's first trial but was unavailable to testify at his second trial. Appellant contends that the witness's testimony was inadmissible hearsay that did not fall within the prior testimony hearsay exception, OCGA § 24-8-804 (b) (1), and that violated his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution. Appellant further argues that, even if the witness's

---

obtained through an improper search of Appellant's backpacks. See *Kennebrew v. State*, 299 Ga. 864, 868-874 (2) (792 SE2d 695) (2016).

Prior to Appellant's retrial, the knife charge (Count 8) was nolle prossed and new counsel filed a motion to suppress the evidence recovered from the backpacks. The trial court denied the motion to suppress on the ground that the evidence "would have inevitably been discovered through a lawful inventory search." Appellant then sought interlocutory review of the trial court's ruling in this Court. We granted Appellant's interlocutory appeal and reversed the trial court's ruling. See *Kennebrew v. State*, 304 Ga. 406, 406 (819 SE2d 37) (2018).

Appellant was then re-tried by a jury from February 5 through 11, 2019. The jury found Appellant guilty of all counts, and the trial court sentenced Appellant to life in prison for malice murder (Count 1), 25 years consecutive for armed robbery (Count 4), and five years consecutive for false imprisonment (Count 5). All remaining counts were either vacated by operation of law or merged for sentencing purposes. Appellant timely filed a motion for new trial on February 11, 2019, which was amended through new counsel on March 23, 2022. After a hearing, the trial court denied the motion as amended on August 31, 2022. Appellant filed a timely notice of appeal. The case was docketed to this Court's April 2023 term and submitted for a decision on the briefs.

2

prior testimony was not altogether inadmissible, the trial court abused its discretion in failing to exclude double hearsay within that testimony. Appellant also challenges the trial court's admission of hearsay statements made by the victim, which were admitted under the residual hearsay exception, OCGA § 24-8-807. We affirm for the reasons set out below.

1. The evidence at trial showed the following. In October 2011, Alexander lived with his friend, Darrious Oliver, in a one-bedroom apartment at the Wellington Court Apartments in DeKalb County. Alexander frequently sold marijuana at the apartment, and the men kept large amounts of cash and "a lot" of weapons, including several pistols, a rifle, and a sawed-off shotgun, hidden throughout the apartment. They also had several electronic devices, including a MacBook laptop, an HP laptop, two PlayStation 3s, an Xbox, and a 42-inch television. In addition, they had a 50-inch television that, according to Oliver, Alexander had recently bought from Mason

Babbage.[2]

Alexander's sister, LaShonda Hiley, testified that, a few days before October 18, she overheard Alexander having a heated discussion on the phone with someone. Hiley stated that, after Alexander hung up the phone, he told her that Babbage "wanted his TV back," but that he "ain't selling his TV back" to Babbage.

Cell phone records introduced at trial revealed that, on October 17, Appellant sent a text message to his roommate, Joseph Torres, who was also Babbage's brother. The text message stated, "Find out when Dough Boy work." Oliver, who was known as "Dough Boy," later testified that he knew Babbage but did not know Appellant, and that Appellant would not have any legitimate reason to need to know his work schedule. That same day, according to the testimony of Erin Tew, who was Samuel Hall's girlfriend, Tew overheard Hall talking on speaker phone to Babbage about "[h]itting a lick."[3]

---

[2] Appellant was originally tried along with Babbage and another co-defendant, Samuel Hall.

[3] Tew testified at Appellant's first trial. Because she had died before Appellant was retried, her testimony from the first trial was read to the jury during Appellant's retrial.

According to the cell phone records, in the early morning hours of October 18, Babbage's phone sent text messages to both Appellant's and Samuel Hall's phones and received responses from both phones. Shortly after, Appellant's girlfriend, Durriyyah Mullins, dropped off Appellant at his apartment on Boundary Boulevard in Suwanee. Around 10:00 a.m., according to cell-phone location data, Babbage's and Hall's phones traveled from the area of Hall's residence to the area of Appellant's apartment.

At 11:36 a.m., Babbage's phone sent a text message to Alexander's phone. Cell-phone location data showed that, minutes later, Appellant's, Babbage's, and Hall's phones traveled from the area of Appellant's apartment to the area of Alexander's apartment complex. The phones stayed in that area until approximately 12:25 p.m., when Alexander's neighbor called 911 to report a home invasion. The cell-phone location data indicated that their phones then traveled to the area of Hall's residence.

Officers were dispatched to Alexander's apartment. Upon arrival, officers found that the apartment had been "ransacked" with

"stuff flipped over like someone had been searching for something." Officers saw Alexander, who was "unresponsive" but breathing, "l[y]ing facedown" in the living room with "his face . . . in a pool of blood." Alexander was "hogtied" with "his hands . . . tied behind his back with a black cord" and "[h]is feet . . . tied together with a white cord." Officers also observed Alexander's teeth had come out and were "around [his] body" and "a piece of [his] ear . . . on the floor." An autopsy later revealed that Alexander had "a mixture of sharp-force and blunt-force injuries," as well as a "profuse amount of hemorrhage" beneath his scalp, and that his cause of death was "stab wounds [to] the neck" with "blunt force head trauma" contributing to his death.

Tew's testimony indicated that Hall contacted her shortly after leaving the crime scene. According to Tew, around 12:30 p.m., Tew received two text messages from Hall, which stated, "I think we f**ked up," and "I think we killed somebody."

Later that afternoon, Jazmine Tew White, who was Tew's daughter and lived at Hall's apartment, came home from school and

6

saw Hall and Babbage with "[an]other person." She testified that the men had with them several electronics that she had never seen before, including "two flat screen TVs" and "an Xbox." White further testified that the men were "smoking," that everyone seemed "laid back" and "really chill," and that the men were "shaving their hair."

According to Tew, sometime that afternoon, Hall sent her a picture of "[a] sink full of dreads" and a picture of himself "with a bald head." She further testified that, when she got home from work that night, Hall was "really out of it" and "didn't say anything" other than that "it wasn't even worth it." According to Tew, the next day, Hall mentioned that Babbage and some "other boy" tried to "leav[e]" him, that Hall "had to run after the car," and that Babbage was worried that "he had been seen" by someone.

Mullins testified that, although she and Appellant generally would text "[f]requently . . . [t]hroughout the . . . entire day," Appellant had been unresponsive to her text messages on October 18, which worried her "because [she] never liked [Torres] or [Babbage]." Mullins further testified that she saw Appellant around

7

10:30 in the evening of October 18, and that she noticed "[h]e had on different clothes" than when she had dropped him off at his apartment that morning. According to Mullins, on the evening of October 18, Appellant did not mention anything about the incident or being afraid of anyone.

On October 19, Babbage voluntarily entered a DeKalb County Police Department precinct and submitted to an interview. Following the interview, Babbage was arrested. Appellant and Hall were arrested soon after.

Appellant waived his *Miranda* rights[4] and spoke to a detective in a video-recorded interview that was played for the jury. During the interview, Appellant told the following story. On the morning of October 18, Appellant's girlfriend drove him to his apartment, where he had planned to meet Babbage because Babbage knew someone who was interested in buying Appellant's PlayStation. After meeting Babbage at Appellant's apartment, Babbage drove Appellant to the Wellington Court Apartments, where Alexander

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

8

lived.

Upon arriving, Babbage went into the apartment building while Appellant stayed in the car. Babbage then returned to the car with Alexander, who invited Appellant inside. Appellant was "chillin[g]" with the other men in the apartment, smoking a cigarette on Alexander's sofa, when a man, whom he believed was named "Sammy," entered the apartment, pulled out a pistol, and used the pistol to hit Alexander. Later in the interview, however, Appellant admitted that Sammy, whom officers identified as Hall, had ridden in the car with Appellant and Babbage to Alexander's apartment. After Hall hit Alexander with the pistol, Alexander "f[ell] to the ground."

Hall then "cock[ed] the gun," pointed it toward Babbage, and told Babbage to "tie [Alexander] up." When Babbage refused, Hall told Appellant to hand him the black computer charging cable next to the sofa. Appellant claimed he felt threatened by Hall, so he "tossed" Hall the cable. Hall then tied Alexander's wrists together with "his hands behind his back." When Alexander started "making

9

a moaning noise," Hall told him to "shut up" and then started "stomping on [Alexander]" and hitting him "a bunch of times" with the butt of the gun. Alexander told Hall, "Man, you can have it," and Hall responded, "I know."

Hall then "pointed [his] gun" at Appellant, handed Appellant a large duffle bag, and told Appellant to "look for some money in some shoeboxes or something" in the bedroom. When Appellant was unable to find any money, Hall "started getting mad" and "just started telling [Appellant] to put different stuff inside the bag." Appellant then "loaded the bag up" with "a bunch of stuff," including "a couple PlayStations," "a[n] Xbox," and "a very old MacBook." After loading the bag, Hall told Appellant "to go pull the car around back," and Appellant followed Hall's instruction.

After parking the car and returning to the apartment, Appellant observed Hall "kicking [Alexander] in the head again" and saw that the living room carpet was "saturated with blood." Appellant and Babbage then left Hall with Alexander and brought the duffle bag, along with "two brown pillowcases" filled with

10

electronics and guns, to the car. Appellant then went back to the apartment to get the 42-inch television, and Hall carried the 50-inch television to the car himself.

Hall went back inside the apartment while Appellant and Babbage waited in the car. Appellant and Babbage started driving away without Hall after waiting "a couple minutes" for Hall to return. After pulling out of the apartment complex, they saw Hall running toward the car. Hall then jumped inside the car, telling them, "I thought you left me. I was going to have to bust you," and directed Babbage to drive to Hall's house.

After arriving at Hall's house, Appellant, Babbage, and Hall started "pull[ing] the stuff out of the car" and "tak[ing] it in the house." Hall told Appellant and Babbage to use his barbeque grill to "burn [their] shoes" and said they needed to shave their heads. However, after Hall and Babbage shaved their heads, "the clippers stopped working," and the men "all sat around" at Hall's apartment.

When the detective asked Appellant whether it felt like Hall was keeping Appellant and Babbage hostage, Appellant responded,

11

"Almost." But he said that Hall became "super laid-back" after he "dr[a]nk," "smoked a couple of blunts," and "popped some pill." Appellant said that he later drove with Babbage to drop off the car, and that the men then "g[ot] something to eat."

A search of Hall's residence pursuant to a search warrant uncovered several items that Oliver later identified as belonging to him and Alexander, including a .380-caliber handgun and the 12-gauge sawed-off shotgun. Officers also found "a black burnt piece of cloth." Upon searching Babbage's home, officers found a pair of blood-stained pants, which revealed the presence of Alexander's DNA. Further, a DNA sample taken from a cigarette butt on the sofa at the crime scene was later determined to contain Appellant's DNA.

2. Appellant first contends that the trial court abused its discretion in admitting into evidence the prior sworn testimony of Tew, who testified at Appellant's first trial but had died and was therefore unavailable to testify during Appellant's retrial. We disagree.

12

Prior to Appellant's second trial, the State filed a motion to admit Tew's testimony from the first trial under OCGA § 24-8-804 (b) (1) ("Rule 804 (b) (1)"), the hearsay exception for prior sworn testimony of an unavailable witness. At a hearing on the motion, Appellant objected to the admission of Tew's testimony on several grounds, including that the testimony was inadmissible hearsay not falling within Rule 804 (b) (1)'s exception and that the testimony violated Appellant's confrontation rights under the United States Constitution. Over Appellant's objections, the trial court granted the State's motion to admit the testimony.

At trial, the jury heard Tew's testimony from Appellant's first trial, including her direct examination and her cross-examination by Appellant's trial counsel. Specifically, on direct examination, Tew was asked whether Hall ever explained to her "what actually happened." Tew responded, "No," but that "[h]e said that they tried to leave him." Tew was then asked whether Hall "name[d] who the they were," and Tew responded that she knew Babbage was one of them, but that she "d[idn't] know the other boy." Further, during

13

Tew's cross-examination, Appellant's trial counsel elicited admissions that Tew did not know Appellant and that she had never heard his name mentioned by Hall or Babbage.[5]

On appeal, Appellant argues that the admission of Tew's testimony was hearsay that did not fall within Rule 804 (b) (1)'s exception for prior testimony of an unavailable witness. He also argues that the testimony violated his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution. In support of both of these arguments, Appellant

---

[5] Specifically, the following exchange occurred between Appellant's trial counsel and Tew on cross-examination:

DEFENSE COUNSEL: [D]o you know Phillip Kennebrew?
TEW: No.
DEFENSE COUNSEL: Have you ever seen Phillip Kennebrew?
TEW: No.
DEFENSE COUNSEL: Have you ever heard his voice on a telephone?
TEW: No.
DEFENSE COUNSEL: Have you ever heard his name mentioned by Samuel Hall?
TEW: No.
DEFENSE COUNSEL: Have you ever heard his name mentioned by Mason Babbage?
TEW: No.
DEFENSE COUNSEL: During the conversation with – that you overheard with Samuel and Mason, did you ever hear his name?
TEW: No.

argues that he did not have an "opportunity and similar motive" to develop Tew's testimony at his first trial because Tew's testimony served primarily as evidence against his co-defendants at his first trial, and because his original trial counsel failed to adequately challenge Tew's credibility and her testimony about a third, unknown person having participated in the crimes. As explained below, we are unpersuaded by Appellant's arguments.

(a) First, Appellant argues that Tew's prior testimony was not admissible under Rule 804 (b) (1), which provides that the hearsay rule does not exclude the testimony of an "unavailable" witness if the "[t]estimony [was] given as a witness at another hearing of the same or a different proceeding" and "the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." OCGA § 24-8-804 (b) (1). To satisfy the opportunity requirement imposed by Rule 804 (b) (1), the defendant must have had an "adequate or meaningful" opportunity to cross-examine the witness. *United States v. King*, 713 F2d 627, 630 (II) (11th Cir. 1983) (citation

15

and punctuation omitted). When assessing whether the similar motive requirement is met, the motive in the two proceedings does not need to be identical. See *United States v. Miles*, 290 F3d 1341, 1353 (II) (C) (2) (11th Cir. 2002) ("similar motive does not mean [an] identical motive").[6] Instead, whether a similar motive is present "depend[s] in part on the similarity of the underlying issues and on the context of the questioning." Id. In assessing similar motive under Federal Rule of Evidence 804 (b) (1) and Georgia's Rule 804 (b) (1), courts have looked to factors including whether the defendant faces the same charges in both trials, see id., whether the party opposing the testimony had "at a prior proceeding an interest of substantially similar intensity to prove (or disprove) the same side of a substantially similar issue," *United States v. Jackson*, 335 F3d 170, 178 (I) (C) (2) (2nd Cir. 2003), whether the party opposing the

---

[6] OCGA § 24-8-804 (b) (1) is materially identical to Federal Rule of Evidence 804 (b) (1). See *State v. Hamilton*, 308 Ga. 116, 121 (3) (a) (839 SE2d 560) (2020). "And when we consider the meaning of a rule in Georgia's current Evidence Code that is materially identical to a Federal Rule of Evidence, we look to decisions of the federal appellate courts construing and applying the Federal Rules, especially the decisions of the United States Supreme Court and the Eleventh Circuit for guidance." Id. (citation and punctuation omitted).

16

testimony had a similar "trial strategy" in both proceedings, *United States v. Reed*, 227 F3d 763, 768 (I) (A) (7th Cir. 2000) (citation and punctuation omitted), and the type of proceeding in which the testimony was first presented, see *Shealey v. State*, 308 Ga. 847, 853 (2) (b) (843 SE2d 864) (2020).

Here, Appellant had an adequate opportunity and similar motive to develop Tew's testimony at his first trial. The record shows that Appellant's original trial counsel had an adequate opportunity to cross-examine Tew and meaningfully did so, distancing Appellant from the actions of Hall and Babbage by getting Tew to admit that she had never met Appellant or heard Hall or Babbage mention Appellant's name. Additionally, although the evidence presented at the two trials was not identical, the same charges against Appellant were litigated in the same type of proceeding, the State's theory that Appellant was a party to the crimes remained consistent, and the State's reason for introducing Tew's testimony was the same, namely, to tie Hall, Babbage, and Appellant to the murder and robbery. See *Miles*, 290 F3d at 1353

17

(II) (C) (2) (similar motive to develop witness's testimony on cross-examination existed where, "[a]t both trials, the government offered [the witness's] testimony to prove [the defendant's] involvement in a methamphetamine conspiracy"). Additionally, although Appellant's defense at the first trial was focused on mere presence and Appellant's defense at the second trial was "a combination of" mere presence and coercion, Appellant employed similar trial strategies in both proceedings, attempting to distance himself from Babbage and Hall by asking Tew whether she had ever heard of Appellant or heard Hall or Babbage mention Appellant's name. See *Reed*, 227 F3d at 768 (I) (A) (similar motive to develop witness's testimony on cross-examination existed in part because defendant's "principal strategy" at both proceedings was to impeach the witness); *United States v. Avants*, 367 F3d 433, 444 (II) (B) (1) (a) (5th Cir. 2004) (defendant had a similar motive to cross-examine witness because, in both proceedings, the defendant's goal "was to discredit a witness . . . whose testimony could, if believed, convict him"). Accordingly, the trial court did not abuse its discretion in

admitting Tew's prior testimony under Rule 804 (b) (1).

(b) Appellant also contends that the trial court erred in admitting Tew's prior testimony from Appellant's first trial because her testimony was inadmissible under the Confrontation Clause of the Sixth Amendment to the United States Constitution. The Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. Amend. VI. "With respect to the right to confrontation, the Sixth Amendment provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination." *Burney v. State*, 309 Ga. 273, 282 (3) (a) (845 SE2d 625) (2020) (citation and punctuation omitted). As the United States Supreme Court has made clear, the Confrontation Clause "prohibits the introduction of testimonial statements by a nontestifying witness, unless the witness is 'unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" *Ohio v. Clark*, 576 U.S. 237, 243 (II) (A) (135 SCt 2173, 192 LE2d 306)

(2015) (quoting *Crawford v. Washington*, 541 U.S. 36, 54 (II) (B) (124 SCt 1354, 158 LE2d 177) (2004)).

As discussed above with respect to Appellant's Rule 804 (b) (1) argument, Tew was unavailable and Appellant had a prior opportunity for cross-examination. Accordingly, because the requirements of *Crawford's* Confrontation Clause test are met, Appellant's constitutional argument fails. See *Avants*, 367 F3d at 445 (II) (B) (1) (b) ("The qualities that made [the prior] testimony admissible under 804 (b) (1) make it meet *Crawford's* Confrontation Clause test: unavailability and prior opportunity for cross-examination.")

3. Appellant next contends that, even if Tew's prior testimony was not altogether barred, the portion of Tew's testimony in which she recounted Hall's hearsay statements that "I think we f**ked up," and "I think we killed somebody," should have been excluded under Georgia's Evidence Code.[7] Appellant's claim fails.

---

[7] Based on our review of Appellant's brief, Appellant does not challenge the admissibility of these statements under the Confrontation Clause.

20

At the hearing on the State's motion to admit Tew's prior sworn testimony, defense counsel argued that Hall's statements were inadmissible hearsay, and the State responded that Hall's statements were admissible as "statement[s] by a coconspirator" under OCGA § 24-8-801 (d) (2) (E) ("Rule 801 (d) (2) (E)"). Without expressly ruling on the admissibility of Hall's statements, the trial court admitted the entirety of Tew's prior sworn testimony. However, in its order denying Appellant's motion for new trial, the trial court clarified that Hall's statements were admissible under both Rule 801 (d) (2) (E) and as "statement[s] against interest" under OCGA § 24-8-804 (b) (3).

Assuming without deciding that the trial court abused its discretion in admitting Hall's statements through Tew's testimony, Appellant's claim fails because it is highly probable that any error in admitting Hall's statements did not contribute to the verdict. See *Kitchens v. State*, 310 Ga. 698, 702 (2) (854 SE2d 518) (2021) ("The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict."

21

(citation and punctuation omitted)).

As an initial matter, Hall's statements were not particularly prejudicial to Appellant, as they did not directly implicate him in the charged offenses. See *Stafford v. State*, 312 Ga. 811, 823 (5) (a) (865 SE2d 116) (2021) (any error in admitting hearsay evidence was harmless where the "statements were not especially prejudicial" because they "did not directly implicate Appellant in any crime"). Although Hall used the word "we," his statements did not mention Appellant by name. Further, Tew, who recounted Hall's statements, stated on cross-examination that she did not know Appellant and had never heard his name mentioned.

Moreover, the evidence against Appellant was strong. The jury watched Appellant's interview, in which he stated that he "tossed" Hall the computer charger used to tie up Alexander; helped transport the electronics and guns into Babbage's car, even after he had an opportunity to leave the crime scene; stayed at Hall's house for several hours following the crimes, despite his assertion that he felt threatened by Hall; and that he "almost" felt held hostage.

22

Additionally, the jury heard testimony from White that, after the crimes occurred, the men appeared "laid back" and "chill"; testimony from Mullins that Appellant never mentioned feeling threatened or being afraid of anyone; and evidence that, on the day before the incident, Appellant's phone sent a text message seeking to find out when Alexander's roommate, Oliver, would be working, despite never having met Oliver and having no apparent legitimate reason for inquiring into when Oliver would be absent from the apartment. See *Kitchens*, 310 Ga. at 702 (2) (any error in admitting hearsay statement harmless "[i]n light of the strong evidence of Appellant's guilt"). Given the ample evidence that Appellant participated in the crimes and that he appeared comfortable around Hall and not under coercion, it is highly probable that Hall's double hearsay statement did not contribute to the verdict.

4. Finally, Appellant contends that the trial court erred in admitting into evidence Alexander's hearsay statements through Hiley's testimony. Specifically, Hiley testified that, about one month before the incident, she overheard Alexander on the phone telling

23

someone, "You don't get the TV back. That's not how the streets work." Hiley further testified that she asked Alexander who he was speaking with, and "[h]e said [Babbage]; he want his TV back, but I ain't selling his TV back." We discern no error in the court's decision to admit these statements.

Prior to Appellant's retrial, the State filed a notice of intent to introduce evidence under the residual hearsay exception, OCGA § 24-8-807 ("Rule 807"), which provides in relevant part:

> A statement not specifically covered by any law but having equivalent circumstantial guarantees of trustworthiness shall not be excluded by the hearsay rule, if the court determines that:
>
> (1) The statement is offered as evidence of a material fact;
>
> (2) The statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and
>
> (3) The general purposes of the rules of evidence and the interests of justice will best be served by admission of the statement into evidence.

OCGA § 24-8-807. At a hearing on the admissibility of Alexander's statements, the State argued that the statements had "particular

24

guarantees of trustworthiness" because the statements were corroborated by Oliver's testimony that Alexander had recently purchased a television from Babbage, and because Hiley would testify that, before his death, Alexander was "one of [her] closest siblings," that she saw him "every day," and that she talked to him "[t]wo to three times a day." The trial court found that the statements had particular guarantees of trustworthiness and admitted the statements. In its order denying Appellant's motion for new trial, the trial court further clarified that the testimony was offered as evidence of the material fact that Babbage and Alexander were "having a disagreement prior to Alexander's death," that the testimony "was more probative on that point than any other evidence reasonably procurable because the speaker was deceased," and that "the interests of justice were best served by admission of the statement."

On appeal, Appellant argues that Alexander's statements were improperly admitted under Rule 807. He contends that the statements did not have sufficient guarantees of trustworthiness,

25

the statements did not directly implicate Appellant and therefore had little probative value, and the interests of justice were not best served by the admission of the statements because they could have led the jury to question Appellant's character as someone associated with a person who "killed the victim in cold blood over a minor disagreement." Appellant's arguments fail.

"Under Rule 807, a trial court's decision to admit hearsay evidence is reviewed for an abuse of its discretion." *Tanner v. State*, 301 Ga. 852, 856 (1) (804 SE2d 377) (2017). A trial court does not abuse its discretion in admitting hearsay evidence not specifically covered by any law where the requirements listed in OCGA § 24-8-807 (1)-(3) are met and the trial court finds that the statements have sufficient guarantees of trustworthiness "because of the circumstances under which they were originally made." *Rawls v. State*, 310 Ga. 209, 214 (3) (a) (850 SE2d 90) (2020) (citation and punctuation omitted).[8]

---

[8] Appellant does not contend on appeal that Alexander's statements were inadmissible under Rule 807 because they were "specifically covered" by another law. OCGA § 24-8-807.

Here, we cannot say that the trial court abused its discretion in concluding that Alexander's statements had sufficient guarantees of trustworthiness. The record shows that Alexander made the statements to his sister, with whom he had a close relationship; there was no evidence presented indicating that he had any motive to fabricate his statements; and his statements were corroborated by Oliver's testimony that Alexander had recently purchased a television from Babbage. See *Ash v. State*, 312 Ga. 771, 786 (3) (b) (865 SE2d 150) (2021) (statements had sufficient guarantees of trustworthiness where the witness and declarant had a "close relationship" and "talked to each other daily"); *Jones v. State*, 311 Ga. 455, 460, 460 (858 SE2d 462) (2) (b) (2021) (statements had sufficient guarantees of trustworthiness where "there was no evidence indicating that [the declarant] had a motive to fabricate her statements"); *Tanner*, 301 Ga. at 856 (1) (statements had sufficient guarantees of trustworthiness where witness and declarant "had a close relationship," declarant had "no apparent reason to lie," and the "statements were consistent with other

27

evidence").

The trial court also did not abuse its discretion in concluding that the statements met the requirements of OCGA § 24-8-807 (1)-(3). The trial court acted within its discretion to conclude that the statements met Rule 807's materiality requirement because they were offered as evidence that the men had a motive to commit the crimes against Alexander based on Alexander's prior disagreement with Babbage. The trial court also exercised its discretion to conclude that the State could not have procured other evidence establishing a motive, particularly because Alexander was deceased and Babbage had a Fifth Amendment right against self-incrimination under the United States Constitution. See *Jones*, 311 Ga. at 461 (2) (b) (statements met the materiality and probative requirements of Rule 807 because the statements were "material as evidence of the nature of the relationship" between the parties and "shed[ ] light on [a] motive in committing the offenses charged," and because the defendant failed to show the State could have procured other evidence "that would have been more probative to show . . .

motive" (citation and punctuation omitted)). Nor has Appellant shown that the interests of justice were not best served by the admission of the statements. Contrary to Appellant's arguments, the statements were probative of motive and did not concern Appellant's character. Accordingly, we conclude that the trial court did not abuse its discretion in admitting Alexander's statements.

*Judgment affirmed. All the Justices concur.*